## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

MITCHELL B.,

          *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

          *Defendant.*

_____/

Case No. 1:25-cv-10497

Patricia T. Morris
United States Magistrate Judge

### MEMORANDUM OPINION AND ORDER ON
### CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 14)

## I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 11) is **DENIED**, the Commissioner's motion for summary judgment (ECF No. 14) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On June 17, 2021, Plaintiff filed an application for Supplemental Security Income, alleging he became disabled on June 12, 2021. (ECF No. 8-1, PageID.62). The Commissioner initially denied the application on June 1, 2022, and on

reconsideration on February 28, 2023.  (*Id.*).  Plaintiff then requested a hearing before an ALJ, which was held telephonically on August 23, 2023.  (*Id.*).  The ALJ issued a written decision on November 29, 2023, finding Plaintiff was not disabled. (*Id.* at PageID.59–74).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on November 13, 2024.  (*Id.* at PageID.53–57).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on February 20, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No. 10).  The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 11, 14, 15).

### B.   Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

D.    **ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 8-1, PageID.73–74). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since June 12, 2021, the alleged onset date. (*Id.* at PageID.64). At step two, the ALJ found the following severe impairments: seizure disorder; migraine headaches; adjustment disorder with

depressed mood; social anxiety disorder; and depression.  (*Id.*).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.65–67).  Next, the ALJ found Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; never have exposure to unprotected heights, moving mechanical parts, open flames, or unguarded standing bodies of water; never drive as a work duty; [can only] understand, carry out, and remember simple instructions; and [can only] perform work in an environment with moderate or less noise intensity.

(*Id.* at PageID.67).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work.  (*Id.* at PageID.72).  However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.* at PageID.72–73).  Specifically, the ALJ found Plaintiff could perform the requirements of an office helper (10,000 jobs in the national economy), a retail marker (120,000), and a furniture rental clerk (56,000).  (*Id.* at PageID.73).  The ALJ thus concluded Plaintiff was "not disabled." (*Id.*).

### E.    Administrative Record

Plaintiff raises several issues on appeal.  First, he argues his severe impairment of epilepsy precludes sustained work activity.  Second, he argues the ALJ improperly discounted medical evidence.  Third, Plaintiff argues the ALJ ignored functional

limitations due to memory loss, mental fatigue, and the unpredictable nature of his seizures. Finally, he argues the ALJ erred by presenting an incomplete hypothetical to the vocational expert. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

Among other issues, Plaintiff has been diagnosed with epilepsy. Around January 2021, Plaintiff suffered a breakthrough seizure[1] while he was camping and drinking alcohol. (ECF No. 8-1, PageID.383). Plaintiff's doctor noted his epilepsy was "not well controlled" and increased his dose of Lamictal (an anticonvulsant medication) while counseling him on common seizure precautions and triggers. (*Id.*). Plaintiff also reported new complaints of headaches, while his depression and anxiety were noted to be well controlled at this time. (*Id.*). Plaintiff had a normal EEG with no epileptiform discharges seen or focal slowing noted. (*Id.* at PageID.385).

At an April follow-up visit, Plaintiff was noted to have been seizure free since his Lamictal dose had been increased. (*Id.* at PageID.386). In June, Plaintiff had an "aura"[2] which was followed by a "blackout spell without generalized convulsive

[1] "A breakthrough seizure is one that occurs following at least 12 months remission whilst on treatment." Laura J. Bonnett, et al., Breakthrough seizures—Further analysis of the Standard versus New Antiepileptic Drugs (SANAD) study, at 1 (2017), available at https://doi.org/10.1371/journal.pone.0190035.

[2] Plaintiff described an aura as "like kind of the dream or a flashback kind of or something like that" as a precursor to his seizures. (ECF No. 8-1, PageID.99).

7

seizure-like activity." (*Id.* at PageID.387).  Plaintiff reported no other seizures at his follow-up appointment in August, at which time it was also noted that his headaches were pretty well controlled.  (*Id.* at PageID.411).  At his next visits in February and March 2022, Plaintiff's headaches were "well controlled," and his seizures were "very well controlled" on medication, though the doctor noted complaints of amnestic mild cognitive impairment likely related to the seizures and headaches and counseled Plaintiff to stay physically, mentally, and socially active.  (*Id.* at PageID.425, 436).  Another EEG in February 2022, showed no epileptiform discharges or focal slowing.  (*Id.* at PageID.567).  In June 2022, Plaintiff's neurologist noted his epilepsy was still well controlled on medications.  (*Id.* at PageID.456).

In September 2022, Plaintiff went to the emergency room after he had a sustained episode of dizziness, lightheadedness, and double vision; however, "Neurology felt that it could be a TIA[3] versus seizure" and he was recommended to follow up with his neurologist.  (*Id.* at PageID.503).  His neurologist started him on a low dose of Topamax in response.  (*Id.* at PageID.535).  Plaintiff had another normal EEG in October.  (*Id.* at PageID.543).  In December, Plaintiff reported no

---

[3] "A transient ischemic attack (TIA) is a short period of symptoms similar to those of a stroke.  It's caused by a brief blockage of blood flow to the brain.  A TIA usually lasts only a few minutes and doesn't cause long-term damage."  Transient ischemic attack (TIA), Mayo Clinic (Feb. 9, 2024), https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679.

additional seizures, and his headaches were very well controlled. (*Id.* at PageID.566). In March 2023, Plaintiff reported a "mini-seizure" to his neurologist, which included dizziness, an aura, headache, and some confusion. (*Id.* at PageID.574). The neurologist increased his medications. (*Id.*).

Plaintiff testified that he had a seizure about once a month, but he would not go to the doctor every time because his wife was a nurse and would take care of him. (*Id.* at PageID.99). Other facts will be discussed below as necessary.

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is

not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to:

(1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical

finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i)  Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)  Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)  Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)  Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)  Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many

types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be."

*Id.* § 404.1520c(b)(2). As such, the SSA

will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally

14

persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

    (i)    Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)   Statements about whether or not [the claimant has] a severe impairment(s);

      (iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

      (iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

      (v)    Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

      (vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

      (vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

      (viii)    Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

      The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits."  *Id.*  The SSA will, however, "consider all

16

of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

18

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

19

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)   Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason

is very risky for [the claimant]; or

(5)    The treatment involves amputation of an extremity, or a major
       part of an extremity.

*Id.* § 404.1530(c).

## G.    Argument and Analysis

Plaintiff argues his epilepsy precludes sustained work activity.  Second, he argues the ALJ improperly discounted medical evidence.  Third, Plaintiff argues the ALJ ignored functional limitations due to memory loss, mental fatigue, and the unpredictable nature of his seizures.  Finally, he argues the ALJ erred by presenting an incomplete hypothetical to the vocational expert.

### 1.    Epilepsy Listing

Plaintiff argues his medically documented impairments satisfy the listing for epilepsy at step three.  (ECF No. 11, PageID.585).

Step three analyzes whether a claimant's impairment is so severe as to conclusively presume disability.  *Sullivan v. Zebley*, 493 U.S. 521, 535 (1990). Plaintiff has the burden to show that his impairment met "*all* of the specified medical criteria" for the listing.  *Id.* at 530 (emphasis in original).  "'When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.'"  *Snyder v. Comm'r of Soc. Sec. Admin.*, No. 20-cv-12102, 2022 WL

1044046, at *4 (E.D. Mich. Jan. 11, 2022) (quoting *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004)), *report and recommendation adopted*, 2022 WL 814013 (E.D. Mich. Mar. 17, 2022).

Here, under Listing 11.02, the epilepsy must be

documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)); or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see

> 11.00G3b(iii)); or
> 5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.02.

The ALJ did not find Plaintiff had a marked limitation in any of the factors under (C) or (D) and Plaintiff does not dispute those findings, so he has waived any arguments under those subsections.  Nor is there any evidence that Plaintiff had seizures "at least once a week," so part (B) is precluded.  The only argument Plaintiff can make, therefore, is under part (A).

The evidence does not support that Plaintiff has seizures at least once a month. In August 2021, Plaintiff filled out and returned a "seizure questionnaire" in which he reported having had only two seizures in the preceding twelve months.  (ECF No. 8-1, PageID.279).  His medical records only establish that Plaintiff had three other potential seizures between January 2021 and March 2023.  In January 2021, Plaintiff reported a seizure.  (*Id.* at PageID.383).  In September 2022, Plaintiff presented to the emergency room for an episode of dizziness, lightheadedness, and double vision, which the hospital diagnosed and treated as a TIA.  (*Id.* at PageID.503).  Finally, in March 2023, Plaintiff's wife reported a "mini-seizure" in which Plaintiff experienced dizziness, an aura, headache, and some confusion.  (*Id.* at PageID.574). Even assuming these were both seizures, they do not provide medical evidence of one per month as required under Listing 11.02(A).

Plaintiff testified that he was getting a seizure about once a month on average

but that he did not go to the doctor every time because his wife was a nurse and she would take care of him.  (*Id.* at PageID.98–99).  The ALJ acknowledged this testimony but found Plaintiff's statements were not consistent with the medical evidence and other evidence in the record.  (*Id.* at PageID.68).  The Court agrees.

Although it may be understandable that Plaintiff might not go to the doctor for every seizure, it is less understandable why Plaintiff would not—at the very least—report these seizures either (1) to his own treating neurologist, either at the time or at any follow-up appointment, who consistently described Plaintiff's seizures as well or very well controlled and only noted one or two seizures in a two-year span, or (2) on his seizure questionnaire, which Plaintiff filled out during "a bad year" for seizures.  (*See id.* at PageID.99, 279).  The ALJ also noted other inconsistencies in the record between "claimant's reported symptoms and his contemporaneous physical presentation," including an observation of Plaintiff walking 100 feet to a clinic without showing any signs of distress or physical difficulty, only to immediately complain of pain and show signs of distress after entering the clinic.  (*Id.* at PageID.69).  Plaintiff points to no evidence in the record to dispute the ALJ's findings.  Therefore, substantial evidence supports that Plaintiff was not experiencing seizures to the degree he testified and the ALJ did not err in proceeding to steps four and five of the analysis.

## 2.    Mental Limitations

Plaintiff next argues the ALJ and state agency examiners erroneously found his mental impairments non-severe. (ECF No. 11, PageID.591). However, the ALJ's decision does not support this argument. The ALJ explicitly disagreed with the state agency examiners and found severe mental impairments. (ECF No 8-1, PageID.71 (finding psychologist's conclusions of only mild mental limitations "not persuasive" and finding the evidence "warrants a finding of work-related mental functional limitations")). The ALJ therefore limited Plaintiff's RFC to work with simple instructions. (*Id.* at PageID.67). Plaintiff responds that this finding "supports [his] position that these impairments significantly impact his ability to work." (ECF No. 15, PageID.619). But what is not clear from Plaintiff's argument is how the ALJ erred and what additional RFC limitations Plaintiff thinks are supported. (*See also id.* at PageID.620 ("These specific functional limitations are not adequately captured by a simple instruction limitation.")).

The inadequacy is not in the ALJ's decision but in Plaintiff's briefing of his issues. Indeed, "Plaintiff's brief is difficult to follow and lacking any detailed support from the record." *Deguise v. Comm'r of Soc. Sec.*, No. 12-cv-10590, 2013 WL 1189967, at *2 (E.D. Mich. Feb. 19, 2013), *report and recommendation adopted*, 2013 WL 1187291 (E.D. Mich. Mar. 22, 2013). Plaintiff has not met his burden to show that additional limitations were necessary in the RFC.

### 3. Functional Limitations

Plaintiff next argues the ALJ ignored functional limitations from his memory loss, mental fatigue, and the unpredictable nature of his seizures. (ECF No. 11, PageID.591). He argues his "inability to complete even simple instructions consistently, his need for daily support from his wife, and his withdrawal from routine activities due to seizure anxiety reflect disabling functional limitations inconsistent with sustained work." (*Id.*).

Again, Plaintiff's briefing is inadequate to fully address this issue and must be deemed waived:

> While the undersigned has thoroughly reviewed the record evidence, the parties' submissions, and the ALJ's decision, plaintiff cannot simply make the claim that the ALJ erred by not adopting a hypothetical posed to the vocational expert, while leaving it to the Court to scour the record to support this claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted); *Crocker v. Comm'r of Soc. Sec.*, 2010 WL 882831 at *6 (W.D. Mich. 2010) ("This court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments.") (citation omitted).

*Deguise*, 2013 WL 1189967, at *7. Plaintiff does not cite to the record once in this argument. The only caselaw he cites to is for a general proposition that does not detail the specific issue Plaintiff is arguing. Moreover, it does not explain how the ALJ's RFC is inadequate given the limitations he imposed on Plaintiff. The Court's review does not show any error, and the Plaintiff has failed to point to any.

### 4.    Incomplete Hypothetical

Finally, Plaintiff argues the hypothetical posed to the vocational expert was inadequate as it did not "incorporate Plaintiff's documented memory impairments, postictal fatigue, or non-exertional limitations."  (ECF No. 11, PageID.592).  This argument is similarly lacking.  Plaintiff has not demonstrated the ALJ's RFC was inadequate nor pointed to any evidence in the record which does so.  Although the Court agrees that an RFC must fairly incorporate all significant impairments, Plaintiff has not established any impairments which the ALJ did not either incorporate or find non-severe.

In relation to Plaintiff's conclusory allegations of error with memory and fatigue impairments, the ALJ found psychologist Karen Marshall's opinion persuasive to the extent she thought Plaintiff could "understand, remember, and complete simple and repetitive tasks.  In regards to complex tasks, he may complete them at a mild to moderately decreased rate of pace due to fatigue and forgetfulness." (ECF No. 8-1, PageID.71).  Therefore, the ALJ imposed a simple task limit in Plaintiff's RFC.  Plaintiff has not detailed any error and has thus waived this argument.  It is his burden to demonstrate that greater limitations were necessary in the RFC.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).

To the extent the Court has missed any other arguments Plaintiff believes were raised, they were cursorily briefed, not sufficiently brought to the Court's attention,

and are thus deemed waived.

**III.**   **ORDER**

For these reasons, Plaintiff's motion (ECF No. 11) is **DENIED**, the Commissioner's motion (ECF No. 14) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: January 12, 2026               S/PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge